Vinezia v 701 Mar. LLC (2024 NY Slip Op 51697(U))

[*1]

Vinezia v 701 Mar. LLC

2024 NY Slip Op 51697(U)

Decided on December 16, 2024

Justice Court Of The Village Of Piermont, Rockland County

Ruby, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 16, 2024
Justice Court of the Village of Piermont, Rockland County

Vincent F. Vinezia, Claimant,

against
701 Marina LLC, a domestic limited liability company, Defendant.

Case No. 24-110003

For the Claimant: 
Vincent F. Vinezia; pro se Claimant boatowner, testified at trial
For the Defendant, by its Employees:
Andrew Impagliazzo; Marina manager, testified at trial; 
Mark Derfuss; Certified travel lift operator, testified at trial; and,
Don ("Donnie") Grippo; Spotter & certified travel lift operator, testified by affidavit [FN1]

Marc R. Ruby, J.

PROCEDURAL POSTURE & JURISDICTIONAL STATEMENT
This action commenced upon the filing of the Claimant's $3,000.00 claim, arising from damages allegedly sustained to his sailboat, while at the Defendant's marina. When the claim was filed on November 4, 2024, the Claimant named "Tappan Zee Marina" as a defendant. The marina's manager was also named individually, as a co-defendant. At the ensuing trial, on December 4, 2024, the parties agreed the case was properly brought against "701 Marina LLC", and that there was no intention of attempting to hold the manager personally liable.
This stipulation was based on the premise that the marina has been operating in Piermont for many years, and a predecessor operator conducted business as "Tappan Zee Marina." It bears mentioning that the Secretary of State similarly indicates a now-dissolved corporation, entitled "Tappan Zee Marina", was chartered back in 1966. The parties were harmonious inasmuch as the subject marina is still colloquially known as the "Tappan Zee Marina."[FN2]
Accordingly, the [*2]caption has been amended to reflect 701 Marina LLC as the correct and sole defendant herein.

TESTIMONIAL EVIDENCE ADDUCED AT TRIAL
The Claimant's testimony is summarized as follows. For the past 20 years, the Claimant has owned Infinity—a 6,000lb, 26' 1981 Pearson sailboat, with a dagger-keel and a fiberglass-hull. Infinity is insured, and registered with New York State's Department of Motor Vehicles. She has an 8' beam, is fitted with a 7.5 horsepower outboard motor, and is steered by a tiller, connected to a 200lb spade rudder. Where the draw at the keel is 4', the draw at the rudder is only 2.5'. So, if Infinity found the bottom, without rolling, the keel would hit ground before the rudder. It is estimated that Infinity was valued between $5,000.00 and $7,000.00, in early November 2023.
This was when the Claimant set off from the Hook Mountain Yacht Club ("HMYC"), in Nyack, NY, to the 701 Marina, in Piermont, NY, where Infinity was scheduled, under pre-arranged agreement, to be hauled out of the water, and laid up on dryland, in winter storage. While the HMYC is Infinity's home port, she has been hauled, and wintered at the 701 for the past several years. The Claimant prefers to be present when Infinity is hauled, because on previous occasions, the 701's predecessor owners caught Infinity's rudder on the traveler lift's straps, when hauling her for the winter.
Inasmuch as the rudder weighs 200lbs, and is coupled to the hull, by a large shaft, there is no practical way of removing the rudder, while Infinity is afloat. Moreover, the Claimant has no role in hauling Infinity. Instead, one marina employee boards the boat, steers her into a slip, below a travel lift, which is fitted with two large straps. This person in known as the "spotter." The spotter ensures one strap is placed under the hull, fore of the keel, but aft of the bow. Then, the spotter ensures the second strap is placed under the hull, aft of the keel, but fore of the stern. This strap placement creates optimum stability, when the travel lift raises the boat out of the slip. Otherwise, aside from securing the tiller in a midship position, to straighten the rudder, there is no particular procedure peculiar to Infinity, associated with hauling.
The trip downriver from the HMYC was uneventful. The Claimant motored, because there wasn't enough wind to fly the sails. Nevertheless, Infinity was perfectly seaworthy. When the Claimant arrived at the 701 in time for his scheduled haul, he noticed another boat was occupying the travel lift. As a result, marina employees waved, and instructed him to tie Infinity up, by the gas dock.
The river bottom near the gas dock is soft and silty. The water is shallow, and according to the lift operator, there are some submerged navigational hazards. No soundings or other warnings are posted on, or around the dock. After securing Infinity's bow, stern, and spring lines, the Claimant spoke with the employees upon coming ashore, and was told it was too late for hauling Infinity, and she should remain on the dock overnight. The tide was low, and the Claimant asked if Infinity would be alright where she was. After asking if she "was good, or would bottom out", the employees responded, "No problem. Don't worry about it." With nothing else to do, the Claimant left Infinity tied up, and departed the 701.
About 10 days later, the Claimant returned to the 701, and found Infinity cradled in the boatyard. However, the Claimant quickly noticed her rudder's post was bent, and obstructed by the outboard motor. When the tiller moved, the top of the rudder would rub against Infinity's hull. The Claimant testified there was no way the rudder was in this condition, when he left the 701. He further stated there was no way he would have been able to make a portside turn, and get Infinity onto the dock. When the Claimant spoke with someone at the 701, he was told the employees who'd hauled Infinity would have a look at the rudder, and get back with him. After [*3]some time passed, and the Claimant had not heard anything, he tried calling the 701 several times over the off-season. This pattern persisted until Spring 2024. As a result, Infinity was not ready to launch for the new sailing season.
When the Claimant received a call from the 701, he was asked if he wanted to keep Infinity in storage for the summer. The Claimant declined, indicating he was "the guy with the rudder", and wanted the 701 to pay for a replacement, or submit a corresponding claim to its insurance carrier. When the 701's manager asked if the Claimant had an estimate for a new rudder, the Claimant texted him a link to an online store, operated by D&R Marine, Inc., out of Assonet, MA. After not receiving a response, the Claimant purchased the rudder, on July 16, 2024, at a total cost (inclusive of packaging and freight charges) of $2,952.00. A paid invoice, memorializing this, was received into evidence as part of "Exhibit C1."
When the rudder arrived from Assonet, in late August 2024, the Claimant installed it himself, with quite a bit of difficulty, while Infinity remained cradled at the 701. Whereas the Claimant did not have access to, or control over Infinity, during the hauling process, he had unfettered access to her, once out of the water, and stored on the yard. Although the rudder installation was ultimately successful, another problem arose. While the Claimant was installing the rudder, he noticed a pile of recently charred debris, in Infinity's immediate vicinity. And upon closer inspection, the Claimant noticed heat-blistering on Infinity's starboard rub-rail. The 701's employees testified that the Piermont Fire Department responded to an active fire in the boatyard, in late August. As such, and as will be discussed, while the 701's manager disclaimed liability for the rudder damage, he expressed a willingness to compensate the Claimant for the blistered rub-rail. A $469.99 quote for a rub-rail kit, from Boat Outfitters, was also received into evidence, as part of "Exhibit C1." In late September 2024, Infinity was relaunched from the 701, and returned to the HMYC.
During the Defendant's case-in-chief, the 701's manager, and travel lift operator testified. Neither are members of 701 Marina LLC; rather, both are employees. However, the 701's manger was given express authority to defend and/or settle the case on the entity's behalf. By way of background, the 701 does not own the property where the marina is located; the 701 operates the marina under a lease agreement with the property's landlord. The manager has worked at the 701 for the past 4 years. He does not operate the travel lift, and was not present when Infinity was hauled. But in all his time at the 701, a boat's rudder has never been damaged during hauling, or launching.
To this end, the travel lift operator and spotter are highly experienced. They have worked together for the past 35 years, and each has been actively working in the marine industry for even longer. Both have extensive experience, training, and even possess certifications for operating the travel lift. The operator who hauled Infinity, has been operating the 701's travel lift for 7 years, and had hauled Infinity on at least 2 previous occasions, without incident. Neither the spotter, nor the operator were the employees who told the Claimant to leave Infinity on the dock overnight.
In any event, each time they hauled Infinity, her tiller was first duly secured amidship by the spotter, so the rudder would be stationary, and in line with the keel. In addition, since Infinity's rudder is all the way astern, there is no opportunity for the rudder to pass over either of the straps attached to the travel lift. When entering the lift slip, the bow and keel pass over both straps. But according to the operator and spotter, the straps are secured close to the keel (fore and aft), and therefore, the rudder cannot encounter either strap.
Although neither the lift operator, nor the spotter noticed anything amiss after hauling [*4]Infinity, the operator indicated that the wind had come up the night before, while Infinity was on the dock. And he stated it was possible that Infinity could have sustained damage there, from rocking back-and-forth, when the tide ebbed. However, the 701 is steadfast that there is no way Infinity's rudder could have been damaged during the hauling process.
Yet, even if Infinity was damaged during hauling, the 701 points to a liability limitation clause, under Provision 12 of the winter storage agreement between the 701 and the Claimant ("Agreement"). While the Claimant denied having received the 8-page Agreement, the 701's manager produced an email he'd sent the Claimant, with the Agreement attached as a .PDF. In pertinent part, Provision 12 states:
By entering into this Agreement, the Owner acknowledges that he or she is aware of the various types of risks involved in keeping a boat at a marina. Owner accepts the slip, docks, piers, their appurtenances and all common areas "as is" and agrees they are in satisfactory condition, safe and suitable for use by Owner and Owner's guests/invitees. Owner agrees that use of the slip, Marina grounds/facilities, parking and other common by Owner, Owner's guests and invitees shall be at their own risk of property loss/damage and/or personal injury/death, arising from any cause whatsoever. Owner further agrees that neither 701 Marina, nor any of its agents, employees, officers, directors, or other representatives shall be liable for any loss, damage or injury to the person or property of Owner or of Owner's guests, invitees or servants, including any loss or damage to Owner's boat, motor vehicle(s), or their contents or equipment, regardless of whether such loss, damage, personal injury or death be occasioned by fire, storm, theft, vandalism, collision, ice, sinking, act of God, or any other cause or condition, including, but not limited to the negligence (but not gross negligence or willful misconduct) of 701 Marina, its agents, employees, officers, directors, or representatives [. . .].
In addition, a paid invoice from the 701 for "winter storage" and "winter powerwash" was also received into evidence, as part of "Exhibit C1." There is no mention of hauling/lifting.

LEGAL ANALYSIS
A judgment rendered in small claims court must render substantial justice according to the rules and principals of substantive law. Evans v. Montauk Mar. Basin, Inc., 31 Misc 3d 134(A), 1 (App Term 2011). In the small claims context, while UJCA § 1804 states that an itemized invoice which is marked "paid", or, two itemized estimates provide a means of proving damages, a party's binding admission trumps this rule. Len v. Home Depot, 61 Misc 3d 835, 838 (Cohoes City Ct 2018, Marcelle, J.).
Under the "savings to suitors" clause of USCA § 1333, state courts may entertain suits sounding in admiralty, where the claim is in personam against an individual, and not in rem, against a vessel. Fotopoulos v. Royal Viking Star, 1990 WL 293696 *1, 1991 AMC 903 (Civ Ct Dec. 19, 1990). But admiralty jurisdiction will not automatically displace state law. Cammon v. City of New York, 95 NY2d 583, 587 (2000). In assessing whether New York law is preempted, relevant factors include: whether State and Federal law conflict, uniformity is hindered, substantive changes are made, or there is interference with characteristic features of maritime law or commerce. Id., at 587-88. By way of example, since traditional principles of maritime law only permit a defendant to be held liable upon proof of actual negligence, strict liability provisions of State law are preempted when cases have a maritime "situs" and "nexus". Eriksen v. Long Is. Light. Co., 236 AD2d 439, 440 (2d Dept 1997).
A [business entity] may appear as a party in a small claims action [. . .] by any authorized [*5][. . .] employee [. . .] provided that the [employee has] the requisite authority to bind the corporation in a settlement or trial. Gago v. 3 Hassell Place, LLC, 66 Misc 3d 145(A) (App Term 2020); See NY UJCA § 501 & § 1809 (2). In turn, under the doctrine of respondeat superior, business entities are liable for the torts of their employees, when committed within the scope of business. Poplawski v. Gross, 81 AD3d 801, 803 (2nd Dept 2011). Interestingly, imputed negligence, vicarious liability, and respondeat superior, are all synonymous. Connell v. Hayden, 83 AD2d 30, 45 (2nd Dept 1981), quoting, Prosser, Torts (4th ed), § 69, p. 458). This concept is especially trenchant in small claims actions, because justice courts lack jurisdiction for granting the equitable relief of "piercing the corporate veil." Paonessa v. Americore Drilling & Cutting, Inc., 57 Misc 3d 137(A), 2 (App Term 2017); Akbulut v. Five Stars Serv. Sols. Corp., 81 Misc 3d 142(A), 2 (App Term 2024); Battle v. Smith, 35 Misc 3d 126(A), 2 (App Term 2012).
Similar to rent, wharfage is compensation for the use and occupation of a pier or bulkhead. Blank v. Mar. Basin Co., 178 AD 666, 667-668 (2d Dept 1917). When a pleasure boat owner pays wharfage to keep her boat at a marina, she receives the privilege of mooring in exchange. Marino v. Gagliano, 50 Misc 2d 499, 500, 502 (Sup Ct 1966). However, a wharfinger [FN3]
is not an insurer; but is simply obligated to use reasonable care in keeping her dock reasonably fit for boats invited to enter the marina. Milo v. Biegler, 86 AD2d 503, 503 (1st Dept 1982). So, when a wharfinger invites a ship to her wharf for purposes of profit, the ship must be given notice of hidden dangers attaching to the wharf, or berth along its side even if the wharfinger has not created or increased those dangers. La Brecque Co. v. Edward J. Barton Lighterage Co., 204 AD 401, 403 (1st Dept 1923). As a result, a wharfinger must exercise proper care and diligence in ascertaining defects of the wharf, and its slips. Vroman v. Rogers, 132 NY 167, 171 (1892).
However, a marina may not be negligent in a loss, if the loss is not due to the docking facility's condition. Weissman v. City of New York, 20 Misc 3d 562, 564 (Civ Ct 2008). Meanwhile, for their part, patrons of a wharf are charged with a duty of ordinary care in using the wharf and harbor. Vroman, 132 NY at 171. For instance, when a boatowner can see tree branches hanging over her dry-docked boat, the marina has no duty to warn her of the condition. Sorce v. Great Oak Mar., 282 AD2d 598, 599 (2d Dept 2001). At the same time, there is a distinction between vis major damages, resulting from natural causes, and non-prudent and non-diligent actions of people. Balzano v. Kutchytska, 41 Misc 3d 1213(A), 3 (Civ Ct 2013). In all events, an accident between a moving vessel and a stationary object is an "allision", whereas an accident between two moving boats is a "collision." Id. at 4.
Where a slip rental agreement between a boat owner and a marina exists, the marina is not released from liability when the boat owner claims the marina was negligent, unless the agreement contains an express release. Loughlin v. Town of Oyster Bay, 62 Misc 3d 128(A), 1 (App Term 2018). But to be enforceable, the exculpatory clause must be express, and unambiguous. Futterman v W. Shore Mar., Inc., 286 AD2d 367, 368 (2d Dept 2001). The clause is strictly construed against the party seeking exemption, and must clearly provide quarter from liability. Weissman, 20 Misc 3d at 564. Assuming the agreement's exculpatory clause is valid, a marina may be entitled to summary judgment where persons or property suffer a lost, injury, or damages, sustained as a result of fire, theft, vandalism, windstorms, high or low waters, hail, rain, etc., occurring in, or on the marina's facility. Segale v. Nu Wave Mar., Inc., 244 AD2d 326, 328 (2d Dept 1997).
In all events, where an agreement exists between a marina and a boat owner, the boat owner may request an adjudication on an allegation of negligence, concerning the loss of a boat. Wisotsky v. Modern Yachts, Inc., 207 AD2d 344 (2d Dept 1994). At trial, issues of proximate cause are generally determined by the trier of fact. Std. Fire Ins. Co. v. New Horizons Yacht Harbor, Inc., 63 AD3d 1542, 1543 (4th Dept 2009). Once a claimant establishes a prima facie case of negligence, the law presumes the damages resulted from the defendant's negligence, unless the defendant rebuts the presumption by showing otherwise. Tweedy v. Bonnie Castle Yacht Basin, Inc., 73 AD3d 1455, 1455 (4th Dept 2010).
Without an express agreement to the contrary, a marina is not rendered mechanically liable for a boat's disappearance, under a bailment theory, where a boatowner has merely obtained a privilege of mooring. Milo, 86 AD2d, at 503. Rather, a bailor-bailee relationship between a boatowner and a marina arises when the boatowner gives the marina exclusive dominion and control over the boat during all times in question. Albanese v. Cow Bay Mar. Serv., Inc., 155 Misc 2d 232, 233 (App Term 1993).
In La Brecque Co. supra, a boat carrying drums of methyl-acetate from Brooklyn, tied up at its destination dock on the Passaic River, in New Jersey. No soundings were posted on the pilings or bulkhead, and the night watchman did not warn the boat's caption about low tides. When the tide ebbed, the boat listed, and some of the drums were lost into the river. The wharfinger claimed damages for the lost cargo. However, the La Brecque Court held that since the boat was assured of the landing's safety, the boat was not negligent in mooring there.
In Std. Fire Ins. Co. v. New Horizons Yacht Harbor, supra, a boat was damaged when the roof of a marina's storage building collapsed under the weight of a snow load. Even though an exculpatory clause in the contract between the marina and boatowner stated the marina did not accept liability for damage or losses arising from any case—including weather, a triable issue of fact remained, because the marina may have had advance constructive notice of the issue, because: snow contributed to the incident; a lot of snow had fallen during the previous month; another 18 inches of snow had fallen the day before the collapse; and, an identical building had suffered a similar collapse 12 hours before the incidents
Here, at the threshold, even though the claim sounds in Admiralty, this Court has jurisdiction to adjudicate the claim, by applying New York's common law, under both Fotopoulos, supra, and USCA § 1333's "savings to suitors" clause. In addition, since maritime law allows for recoveries where negligence is proven, and since negligence (and not statutory struct liability) is the gravamen of the instant claim, nothing runs afoul of Eriksen v. Long Is. Light. Co., supra. Accordingly, there is no conflict, hinderance, preemption, or interference with maritime law or commerce, as proscribed under Cammon, supra.
As another threshold matter, 701's employees were duly authorized to appear and run defense against the claim, in the same vein as the 701 may, in turn, be held liable for its employees' acts and omissions, in respective accordance with Gago, Poplawski, and Connell, supra.
With these issues settled, attention turns to whether the 701 is liable for Infinity's damage. By crediting the testimony of the Claimant, and the lift operator, there is no doubt Infinity arrived at the marina in a seaworthy condition. After all, the Claimant was able to put Infinity on the dock, without difficulty, and the lift operator did not notice anything amiss, after she was hauled. However, this does not foreclose the proposition that Infinity was damaged at the 701; nor is there any dispute over the proposition that Infinity was indeed damaged.
There is also no dispute that the Claimant paid the 701 for winter storage. What is less [*6]clear is whether the Agreement applies to hauling. For the most part, the Agreement pertains to use of the 701's slips, and this would necessarily entail non-winter months. Moreover, the invoice received into evidence shows the Claimant paid the 701 for "winter storage" and "winter powerwash[ing]"; there is no mention of hauling or lifting. It might stand to reason that hauling was included within the "winter storage." Although someone could just as easily trail their boat at a launch, and drive it to the 701, this is to be what transpired here. As such, the Agreement must be construed against the 701, under Weissman.
In any event, the question of fire damage is more easily resolved, than the question of rudder damage. This is because despite the Agreement's exculpatory clause regarding fire damages, the 701 made a binding party admission at trial, by expressing willingness to compensate the Claimant for the charred rub-rail. Accordingly, under the excellent reasoning announced in Len v. Home Depot, supra, this admission trumps UJCA § 1804's two-estimate/paid invoice requirement. As such, the 701 is liable to the Claimant for the starboard rub-rail's replacement, in a quantum set forth below, despite the Claimant having submitted but a single estimate.
The question of rudder damage must now be addressed. The lift operator and spotter were steadfast in that nothing they did caused the rudder to bend. However, neither the spotter, nor the lift operator were present the previous evening, when the Claimant was instructed to tie Infinity up on the dock. In addition, the lift operator testified that while Infinity was docked, the wind picked up, and the tide went out. He also posited that this confluence of conditions could have caused Infinity to bottom out, while rolling back-and-forth, thereby resulting in rudder damage. Of course, one might ask how the spotter could have then steered Infinity into the travel lift's slip with a damaged rudder. But, the direction to the slip might have been different, the boat's speed might have been lower, and the spotter might not have been at the tiller long enough to notice a problem, or been familiar with Infinity's handling. Plus, the lift operator is a highly experienced marine professional, and his testimony in this regard is not easily dismissed.
While the 701 understandably points to the Agreement's exculpatory clause, which limits its liability, unless it acts with gross negligence, there are overriding factors at play. As indicated, the Agreement makes no mention of hauling. Accordingly, the 701 has difficulty getting around Loughlin, Futterman, and Weissman, because these cases stand for the proposition that in order to find quarter from liability under an exculpatory clause, the clause must clearly exculpate the marina. Yet, the Agreement does nothing of the sort. But this is not all.
The 701 also runs aground under La Brecque, because the 701's employee(s) expressly told the Claimant to park Infinity at the dock. Even after the Claimant inquired whether doing so was advisable, he was given express assurance that it was. Vroman is also problematic for the 701, because a wharfinger must exercise diligence in ascertaining hazards about the dock. Here. the lift operator indicated the water around the dock is not only quite shallow at low tide, but also littered with navigational hazards. Yet, no soundings or other warnings are posted on the pilings. And so even if the Agreement did exculpate the 701, the employee's directions supervened, and the Claimant justifiably relied upon the instruction to leave Infinity on the dock.
It might also be said that Infinity's stay at the 701 was bifurcated into 2 events: hauling and storing. There's no doubt that the storage component did not create a bailor-bailee relationship between the Claimant and the 701. The Agreement is very clear on this score, and the Claimant testified that he was free to come and go, and freely access Infinity as he pleased, while she was cradled. However, since the Agreement does not speak to hauling, and since the Claimant was barred from having anything to do with the hauling operation, it might be said that [*7]a bailment arose, strictly with regard to the hauling. When he left for the night, the Claimant had left Infinity on the dock, in the exclusive control and dominion of the 701. And if a bailment was created, the 701 is liable to the Claimant under Albanese.

 ORDER
Accordingly, as consistent with the foregoing, the Claimant shall have judgment rendered in his favor, for the entire $3,000.00 jurisdictional amount this Court is empowered to award. The $3,000.00 represents the full $2,952.00 cost of Infinity's rudder, and the remaining $48.00 [FN4]
is applied toward the $469.99 rub-rail kit. May she be met with fair winds, and following seas.
IT IS SO ORDERED.
Dated: 16 December 2024
Piermont, NY
Marc R. Ruby
Village Justice

Footnotes

Footnote 1: While the affidavit assisted the Court in ascertaining background and technical information, no part of this decision is based upon the affidavit; nor did the affidavit factor into the decretal portion of this decision. The affidavit was read into the record, verbatim, and each of the points made therein were similarly made through trial testimony.

Footnote 2:This phenomenon occurs in other instances around the locale.

Footnote 3:The owner or occupier of a wharf. Black's Law Dictionary 1626 (8th ed. 2004).

Footnote 4:As such, even if the estimate was grossly inflated, it's hard imaging a section of rub-rail, specific to a very particular marine application, could be obtained for less than $48.00. For it is said a boat is a hole in the water where money is thrown.